When you're ready. May it please the Court, Matthew Malone, Jones-Vargas, Las Vegas, on behalf of the plaintiff and appellant, CBC Financial. I'd like to reserve three minutes for rebuttal. In this case, the district court overstepped its bounds and disregarded facts and law to grant summary judgments for Apex ASI, who is the insurer in this case, and it's our position that the facts should be presented to the jury. I'm going to start with Apex and ASI. Nevada law does provide a right to rescission. Now that right to rescission is very limited. There has to be a misrepresentation in the application. That misrepresentation has to be material, and material means that it affects the risk, the ability to accept the risk, or at least affects the amount of premium that would be charged. Finally, there cannot be a waiver. The waiver under Nevada law is established by the Violin case. In Violin, the Nevada Supreme Court stated that if there's evidence of a misrepresentation preexisting in the insurer's file, and that the insurer had constructive knowledge of a misrepresentation, they cannot come back later and rescind. Let's go over the things they said were misrepresentations. First, they said, the insurer's application said there was one building occupied as a hotel, units, restaurants, two levels, 35,000 square feet, and the premises actually consisted of two buildings consisting of an apartment motel, an unoccupied casino, et cetera. And it was 98,000 square feet. Do you agree that those inconsistencies were in there? I agree that the application, which was not completed by my client, it was not signed by my client, it was not reviewed by my client, that was all done by the insurance agent, Schwartz Insurance Agency, who has since settled in this case. That notwithstanding, I do agree that the application identified one building at 35,000 square feet. Now, to respond to that, the inspection report that was performed before the renewal of the application, the inspection report was in the insurer's and in Bedford's files before the renewal policy. Counsel, that's not the question that we're asking you. We want to know whether or not you agree that there were material misrepresentations in the application. Just some misrepresentations. Then we can discuss whether they're material. I agree that there were some of the items identified by the insurer. 98,000 square feet is a lot more than 35,000. Yes. There are misrepresentations in the application. Whether or not each of the items identified by the insurer are misrepresentations, whether they're material. The idea is not to talk so fast, you get 40 minutes into 20 minutes. Whether those are material or whether or not they're waived, I think is the question we ask. Then it says the premises were 100 percent occupied, and they were not substantially less than 100 percent occupied. I agree. I don't think that there's a misrepresentation regarding the vacancy of the property, because under the insurer's own definition, a property has to be 70 percent vacant in order to be vacant. So under their own criteria, it's not even a misrepresentation. Then it said it had smoke detectors and sprinklers throughout, and it didn't have a sprinkler system throughout. Yes. That would be a misrepresentation. Okay. Then it said that they had a burglar alarm, and they did not have a burglar alarm. Yes. That would be a misrepresentation. Okay. And so you admitted to some misrepresentation. Now, why don't you think they were material? To start with the number of buildings, first of all, the inspection report identified multiple buildings on this property. In fact, there's never really been an agreement based on how many actual buildings there are. The insurer You keep moving to, in essence, your defense that there was a waiver here, but I think what we're trying to understand here is we've got to do this in stages. Okay. First, were there misrepresentations? Now we want to know whether or not they were material. Can you address the materiality issue? Yes, Your Honor. As far as the number of buildings, the underwriter testified that the number of buildings on the property would not have affected coverage. So their own underwriter And remember, rescission is about whether or not the policy would have been issued in the first place. It's not a claims function. It's an underwriting function. Let me ask you this with respect to number of buildings. There's two questions going on here. One is number of buildings, and the other one is how many square feet are insured? And yes, Your Honor, I will add that maybe Is there misrepresentation as the number of square feet in the premises for which insurance is taken out? Right. Well, going to the square footage issue, the underwriter testified that the square footage would not directly affect the premium. The underwriter did testify that she wouldn't underinsure a building. However, that would be based solely on whether or not the amount of insurance that was requested, it was appropriate for the building. There were no standards that the insurer had at that time to identify that. I'm a little confused by your answer. I read the underwriter's testimony to be if the building's bigger than what I think I'm insuring, that influences the risk. Because if we have to insure a bigger building and it's destroyed, there's more value there that we have to cover. And that's why it's material. Did I misunderstand the underwriter's testimony? When she testified to that, she specifically said that that would be based on state law that requires the insurance company to pay for the entire value of the building if it was destroyed regardless of policy limits. When I asked her if she knew Nevada law had such a provision, she said she didn't know. In fact, Nevada law doesn't have such a provision. The insurance in this case was not taken out to insure the entire value of the building. The insurance in this case was taken out to insure the $2 million loan which was placed on the building by Colonial Bank. The only reason for the insurance was that the bank had a loan and they wanted security on the property. In that essence, the building was not underinsured because the $2 million that was taken out is exactly what was needed to cover the loan. That makes absolutely no sense to me at all. If I am an underwriter, underwriting a risk, I would like to know what the potential risk is and then I'm going to decide, A, how big a policy I'm going to write, how much risk I'm willing to assume, and B, how big a premium I'm going to charge you for it. I would like to know, would I not, how big this building is because if it's a million square feet and it suffers a catastrophic fire, the chances are pretty good that I'm going to end up paying the full limits of my policy, whereas if it's only 38,000 square feet, even if it suffers a fire, there may not be a policy limits loss. Isn't that relevant to the underwriting? I don't think so, Your Honor. I think what's relevant is that the insured in this case wanted $2 million of coverage and that $2 million of coverage was meant to insure the amount of the loan that he took out on the property. Whether or not there was damage to the building beyond that $2 million would be irrelevant to the insurer. But the underwriter is not issuing a policy to insure a loan. It's issuing a policy to insure damage to property and it needs to know what the property consists of in performing a competent underwriting, doesn't it? I think that they are insuring the property up to a particular limit. And that particular limit in this case is $2 million. Right. But the determination of what the limit is going to be is a function of many things, not the least of which is how big the building is. That's not true, Your Honor. The underwriter did not testify that the actual square footage would affect the premium. The premium would be determined directly on how much coverage was present. In fact, that's very specifically stated in the underwriter's testimony that the premium is not based on the exact square footage. The premium is based on the limits of the policy that exist. They don't like to insure it for more than the value of the building. I agree and I don't think there's any... There might be a big difference in the value between a 38,000 foot and what was it, 95,000? But the insurer in this case has never stated that the building was over-insured. What they're claiming is that I would not have insured a building that was under-insured. And in fact, they've never even stated that this building was under-insured, just that it may have been under-insured. How bad was the fire? What was the amount of your claim? Well, the fire pretty much totaled most of the building except for the apartment area. So did you make the claim for the full policy limits? No. The claim is less than the full policy limits because our client, CBC Financial, subsequently sold the building. The building was actually in escrow when the fire occurred. And the damages in this case, beyond loss of rents and so on, would be the amount of the difference between the sale before the fire and the sale after the fire. Can you give me a number? I think it's about $900,000. $900,000? Yeah. But I'm not 100% sure on that amount, Your Honor. I'm sorry. How about that they missed, perhaps starting with the least ones, working up the more important ones. How about the fact they misrepresented the extent of the fire sprinkler system? That would certainly go to whether you'd want the premium or whether you want to insure it at all. Yes, Your Honor. I believe that the only defense we have regarding the sprinkler system is the waiver. And the waiver is based upon this November report? November inspection report. And remember, the policy was renewed in May. Now, I read that report. And it says certain things are present. But it doesn't say certain other things are not present. So I looked very hard in that report for a statement that said there is no sprinkler system throughout the building. And it doesn't say that. Actually, Your Honor, I believe it's on ER 933. There's a checklist that was attached to the report. Okay. I think I've got it here in front of me. There's a checklist. And one of the checklist items is sprinkler system. And where is it? I've got it here in front of me. I'm sorry, Your Honor. I don't know exactly where on the page it is. I don't have it in front of me. But there is a check there for sprinkler system. And the check is no. Let me look at all the no's. Fire escapes, no. Vandalism, no. Roof leakage. Crawl space, no. Trash chutes, no. Floor openings, no. Roof, no. Tenants, no. Operations. Playground. Tennis court, no. Sauna bath, no. Exercise room, no. Depths, no. I don't see it. You might want to turn to your own excerpts and see if you can find it for me. I will try and do that while the opposing counsel is making arguments. I looked. I didn't see it. I still don't see it. With regard to the burglar alarm, the underwriter also testified there that there was only, the only grounds it would be for cancellation would be for theft. And the coverage for theft is not at issue in this case. Only the property insurance coverage is at issue in this case. But if you're underwriting the policy, I assume it's a property damage policy, why wouldn't there be a potential risk for property damage in connection with a burglary? And that may be true, Your Honor. However, the underwriter said that that wouldn't have played into her decision regarding this particular coverage. Okay. So that it wasn't important to them that there be a burglar alarm system connected to a central station. The underwriter testified that it wouldn't have been grounds for cancellation of the policy. That if there wasn't one present, even if there was a misrepresentation, I'm not sure that goes to the underwriting risk. That may go to materiality, but. Well, I think we're discussing the materiality of the misrepresentation regarding the existence of the burglar alarm. Okay. I think going back to the number of buildings, I think there was also, when we talk about the inspection report, it mentions multiple buildings. I think the inspection report also mentions that the square footage of the building is in excess of 35,000 square feet. I believe that the inspection report says that the square footage for the residential section of the building alone is 50,087 square feet. Was the casino in the same, the old casino in the same building as the occupied apartment or room? It is our position that it was. I believe that that's a disputed position, and I think if you look at the number of buildings in various different reports, there's a lot of disagreement there. Our client has always maintained that there were two buildings on the property, the old residential section, which was connected to the old casino, and then a separate retail section. I believe that the insurer in the rescinding coverage also said there were two buildings. I think the inspection report actually identified four buildings. So I think that's an issue of fact in this case. Well, as I understand it, one of the problems was the fire started where the old casino was, correct? Yes. And one of the reasons, presumably, that it wasn't discovered more quickly was the fact that it was in an unoccupied portion of the premises. Well, my client's offices were in that portion of the premises, but it was at night, and he wasn't at his office at night. Well, the fire was an arsenal. Yes, it was. So we wouldn't expect the arsonist to set it in the middle of the day when your client's in his office. Right. But it wasn't, that area of the building was not completely vacant. My client's offices were in that part of the building. If I can move specifically to Bedford for a moment, Your Honors. Bedford was a producer of insurance that acted as an intermediary in this case between Schwartz and the ASI and Apex. I think the court erred in dismissing the claim for breach of fiduciary duties against Bedford. Bedford had in his possession applications for this policy going back years. They also had in their possession this application for the 2002 policy and then later the 2003 policy. Bedford also had in its possession the inspection report. Despite this, they never notified CBC of the potential misrepresentations in the policies or that there may be a potential issue in coverage. In fact, the only correspondence we received from Bedford was something saying, if you give the insurer the pictures, if you give the insurer a completed application, you'll be okay. You'll have coverage. The policy won't be canceled. The district court ruled that there's no claim for breach of fiduciary duties against an insurance producer. We submit that that's not in accordance with Nevada law. The Allen v. Webb case established a breach of fiduciary duties claims against a title agent. Now, for purposes of Nevada law, there isn't really much difference between a title agent who is licensed by the Nevada Insurance Division and an insurance producer who is normally licensed by the Nevada Insurance Division. In this case the insurance producer, is that the same thing as an insurance broker? Under Nevada law, there is no legal distinction between broker and agent. They're redefined. Post HIPAA, they were redefined solely as producers. But yes, you could call them a broker. You could call them an agent. In either case, Bedford falls into the definition. Assuming for the moment that there's a fiduciary duty, in what respect did they violate that fiduciary duty? As our position, they violated that fiduciary duty by not checking the application before it was submitted to determine whether or not the application was something that would result in coverage for our client. So the fiduciary, I may be putting words in your mouth, but I think for there to be a violation of the fiduciary duty here, the duty has to extend to the broker or producer saying to the would-be insured, listen, I've determined that you've lied here and you better not lie. Well, the problem is, Your Honor, and this goes back to who completed the application, my client didn't sign the application. He didn't complete the application. He didn't review the application. He relied on others to do that. And the others were, it was Linda, I forget her last name. No, Linda Corby was an employee of my client's. She did not sign the application. Somebody signed, somebody forged her name. Yes, Mr. Tyler of the Schwartz Agency. And where did he get the information that he used before he forged her name? He said he received that information from Ms. Corby. Oh. But, I mean. Who was an employee of your client. Yes. But, however, there were prior applications of the, on the policy for this property and there was the inspection report that were both in the possession of Bedford and they failed to identify that there were these potential problems going forward with coverage. That's a pretty broad extension of fiduciary duty, it seems to me, to make sure that the, to protect the person against his own lies. If they were my client's own lies, that. Or maybe I should just say misrepresent, material misrepresentations. Yes, Your Honor. I'd like to. Yeah, why don't we hear from the other side. Thank you. Excuse me. Was Tyler the one who was ultimately disbarred or. Yes. As an agent or broker? He was, well he was previously a licensed attorney and he was disbarred for an act 10 years ago of insurance fraud and then was later hired by the Schwartz Insurance Agency. As an employee. As an employee. He's not a licensed broker himself. I believe he does have a license now. I believe the Wisconsin Division of Insurance had eventually cleared him. However, we have settled with that defendant. May it please the Court. My name is Diane Mullenix. I'm here on behalf of Respondents' American Safety Indemnity and Apex Insurance Manager. I will address my argument primarily to the correctness of Judge Ezra's ruling in granting the motion for summary judgment. It's our position that there is no reason to disturb that ruling and that the ruling is based on ample Nevada case law and NRS 687. I believe that the moving papers pretty much address whether or not the material representations is a question of law versus a question of fact. I think that the Smith case is controlling. Mr. Malone did not exactly address that in argument today but I did want to touch on that fact briefly. I think the biggest issue in this case involves the question of due diligence and I think it's pretty clear that the justices understand that CBC Financial's position is, well, yeah, we made those misrepresentations but they're not material to the risk and then on top of that you should have known. Judge Ezra did not agree and he specifically said it is not ASI's responsibility to ferret out every lie of an insured to determine whether or not they're telling the truth because to do so would induce fraud and unclean hands. Foremost also said that neither 687B or any case law cited in Nevada supports that contention. In other words, there is no duty of an insurer to perform some amount of diligence in order to ascertain whether or not the information in the application is true. If that was the case, then as Judge Ezra said, you'd be inducing fraud. It would be up to suddenly it would be up to the insurance company to figure out what is true and what is not and I think Judge Ezra pretty much said, you know, Mr. Mabee, you're coming to this party with unclean hands and you want us to understand these misrepresentations and overlook them. However, Foremost specifically said there is no duty that says an insurance company has to go and ferret out every representation to determine whether or not they are material. Touching... I'm with you all the way on that, but what's your response to the argument that inspectors were sent out and they prepared written reports and I assume photographs which they tendered to somebody and it was sitting in the file that would have alerted had anybody bothered to look at them that there might be a problem with the representations that were made here. Certainly. Our position is twofold. Number one, the material misrepresentations were so egregious that the policy was void ab initio. There was no meeting of the minds. Number two, I believe the Foremost opinion said the rescission statute is not triggered by the negligence of the agent or the insurance company in failing to inspect the subject property, but rather the omissions and the misrepresentations in the application. As the duty to inspect or conduct due diligence is not required, whether there is a disputed fact on the issue of the inspection or due diligence is irrelevant. Our position is the inspection report was sent to the underwriter. It was not complete and based on the information that she had, it said one building and, well, actually four buildings, casino and per the insured contact, only this one building. Now, CBC wants to hold us to the information in the inspection report. We want to hold them to the information in there as well. It says per the insured, only one building. At what point does your client see this inspection report? It was received in November 2002, six months after the policy, the first policy had been issued. And in response to that report, your client says you better get on the stick and get rid of those armed guards. Exactly. And I gather there's some other things about the pool. Exactly. So your client has the report. Your client's obviously reading the report. It's obviously acting on the report. Exactly. And it's continuing the insurance only on condition that certain things are done in response to the report. Certainly. Well, that strikes me as your client has noticed what's in there. My question then is, okay, what's in there? Is the report sufficient to indicate to your client that all of those material misrepresentations are not true? And my problem is, as I read the report, it doesn't really negate some of the misrepresentations. It does not negate some of the misrepresentations. So in other words, how can you waive what you don't know? The insurer did not know that the place was not sprinklered. And the report doesn't seem to say that. Maybe you can find it and show it to him in rebuttal, but I couldn't find it in the report. Well, the bottom line is, it was not sprinklered. I mean, if we allow an insured to... My question is not whether it was or was not. My question is whether the report says it was not sprinklered. And I can't find it in the report that says it was not sprinklered. There is a small box that was checked that says sprinklers, no. Oh, I see. Well, maybe you can... I'll help him out and point it out to you. What's the site checked out? A small box that's checked out? A small box that's... There's a checklist that's got items. Can you use a record site? Can I? I'm not sure that I have it right here. Well, why don't you give it to him? I've got E-R-0-9-3-3. Try that. That might be so. Is that correct, Mr. Mahler? Does somebody have it? I think I'm on 931. 931. Is that it? We've got the checklist. It's number 37 on the checklist. Number 37. Oh, I'm on a different page. Okay. 37. Sprinkler system, none. Okay, there it is. I see it. It says none. Correct. And Claudia Kralovec testified in her deposition, I didn't get that checklist. In fact, I never saw that checklist until after the fire. All she got, and she specifically testified, all she got was the narrative report, the checklist of recommendations, and you can see her handwriting is on there. Warrant, warrant, whatever. You can see it's there. I see. So she gets the first three pages, but she doesn't get the attachment? That's what she says? Correct. And she pretty much testified that you don't always see those checklists on inspection reports. So, again, are we throwing the duty back on the insurer to ferret out the lies? And what's the public policy message we're sending out? Who asked for this report? It's standard for the ---- I didn't say it's standard. I said who asked for it. Oh. It was at the request of APEX, but Bedford retained and independent to go out there and inspect it. And were these attachments, were these checkboxes part of the report? No. Well, they were part of the report that was produced after the loss. After the loss was when all of these things started to come to light, and I think that lends credence to Claudia Kralovic's testimony that she never got it. If she had gotten it, and she specifically testified, I would have called and said, hey, what's this about a sprinkler system? Hey, what's this about a no central station burglar alarm? What do you mean, a casino? She specifically said, I would not. Let me ask you this question, if you know. Does the person, you said it's an independent agency, goes out and makes this inspection. Do they have the, is there a purpose to take the application and check what's said in the application? Yes. And both the inspector and Kralovic testified that the inspector has the application in front of them. Why? To make sure that the information on the application matches the property to be insured. And this is particularly true with regard to out-of-state properties. Because the underwriter and the insurance company are back in Illinois and Wisconsin. This property is out in Las Vegas. So your client asks for this report. When were these pages with the check marks prepared? Simultaneously with this report in November? I believe it was. And I believe that the entire report with checklists and photographs was forwarded to Bedford back in November. November, then, Bedford then forwarded on to American Safety and Apex. Unfortunately, they didn't get the whole report. And if they had to. Are you saying that Bedford gives you the first three pages, but omits the later pages? They gave, they, Claudia Kralovic's underwriting file shows the narrative report, the recommendations, and I believe two or three photos. That's it. It wasn't until after the loss, there's a fax from Bedford to American Safety that's 33 pages long, and that's when the checklist comes out. And that's when the whole thing started. People started going, wait a minute. They sent the investigator to go out and adjust the claim. He gets out there and says, okay, there's no sprinkler system here. You know, starts to have the discrepancies, and that's when the reservation of rights comes up, and that's when the rescission comes up. Is there a dispute in the record as to whether or not this page that says sprinklers no was sent to your client before the, simultaneously with the narrative part of the report being sent? Our position is that it is not a dispute because she specifically said, well, if you look at the base stamp pages of the underwriting file, it's not there. All that's there is the pages that I referenced and the photographs. Now, I've got a base stamp at the bottom of this, and they're absolutely in sequence, but I don't know. When you say the underwriting file, I'm not sure about what file we're talking about, but the first page of the narrative report, the base stamp is 0491, then it goes 492, 493, and base stamp 494 is the page that has the check that says no sprinkler system. Yes. And if you look at the base stamp, it's BD. Yeah, that's right. It's BD, as in Bedford's underwriting file. Yes, it does say BD. That's exactly right. Yes. I see my time is up. I need to defer to Mr. White. Let me ask you a moment. What is the insurance company's duty when it receives this report legally? They get thousands of reports. They look at the ones where there's a fire. I think Ms. Kralovec testified that her duty is to make sure that the information in the inspectional report matches what's on the application. Okay. The argument is that having this information, they should have acted before the fire to rescind the policy or adjust the premium or go get it corrected. What is your answer to that argument? My position is you can't waive what you don't know. They didn't have that information in their file. And even so, there's no duty under the case law that says that you have to investigate all those lies. And the misrepresentations being material triggered rescission regardless. I thank you. May it please the Court. Thomas Dillard on behalf of Bedford Underwriters Limited. Your Honor, at the outset, I think it's important to understand kind of a procedural aspect with respect to Bedford's here and the orders that are before the court here on appeal. The fact of the matter is Bedford prevailed or obtained judgment in the case at the pleading stage with a motion to dismiss. Now, before the order came out with that decision, Bedford was brought in from a cross-claim standpoint with respect to the insurance carrier, American Safety, and then participated throughout the discovery process in respect of a cross- defendant or a third-party defendant, I should say. Then at the end of the discovery phase with summary judgment motions filed, there or not plaintiff's claims did have any efficacy following the dismissal, and that was ferreted out with a motion of clarification wherein the district court judge said, with respect to the order that came out on dismissal, there's no allegation of fraud. Nevada law does not recognize a fiduciary duty with respect to insured and an insured's agent, and that there's no allegation nor basis for a negligent misrepresentation claim either. So although they were in the case throughout and there was evidence submitted at summary judgment, in the alternative, if the dismissal didn't take care of the entire three claims against Bedford, then there's summary judgment as well. The court clarified that at the dismissal phase, in terms of valuating the contents of the complaint, there was no failed state of claim for relief. Is there any light you can shed on this question as to whether or not this page with the checkmarks was sent by your client back to the insurance company? Yes, Your Honor. With respect to what happened in discovery, I believe counsel is correct that Claudia Kralovec's testimony was she wasn't aware of the checklist. I wouldn't be surprised that she would testify to that. The sworn testimony from Bedford, in addition to the file that was submitted in sequence, suggested it was sent at the time with the entire inspection report. There was no dispute, as I understand, that the narrative portion of the report was there in addition to the photographs were there as well, but that the checklist, Ms. Kralovec testified she did not have or was unaware of, at least before the fire. So the photographs, well, again, I think I'll ask Ms. Mullins to come back up after we're finished with you, because I have some more questions with respect to this now. Okay. But your understanding is that the photographs were sent by Bedford and the three pages of the narrative were sent by Bedford, and in addition, the intervening pages were sent. That's my understanding, Your Honor. I don't have a cite for you with respect to that, and I hope I'm representing the records correctly, but I feel pretty confident. Okay. Thank you. Evaluation of the claims against Bedford really comes through what the complaint said. Okay? The only allegation, Your Honor, is in the complaint was that there was some licensing infirmity with Bedford, a Wisconsin company operating in Nevada. Now, it's tossed in with respect to that they committed fraud, an Ipsi-Dixit allegation there was fraud, and that there was fraudulent misrepresentation. But the complaint is devoid of any allegation of that fact as to any communication that Bedford, a wholesale broker that had no contact with the insured, they were when the insurance agent needed a surplus line policy, they went through Bedford to say, do you have someone in mind? Can you help us? And they pointed them on to American Safety. Their role here was the conduit. So, and there was no allegation that Bedford had any contact at all with the insured that they could rely upon any information that they relied upon to their detriment with respect to this case. The court disposed of the fiduciary duty claim, I think, as a matter of law, very simply. Nevada law doesn't recognize a claim for fiduciary duty with respect to insured and retail agent, let alone wholesale broker, for which they have no contact with except under extraordinary circumstances. The cause of action of the complaint were for fraud, no allegation at all, and they're not even appealing that. For fraudulent misrepresentation, which is just another way of saying fraud, they're not appealing that. For breach of fiduciary duty for which it's not recognized as a matter of well-established law in Nevada, and for, they make a, there's a title of negligent misrepresentation, but the complaint is devoid of any allegations of what was said, who said it, what was relied upon, even the subject matter. So I think there's ample grounds in addition to all those that we would rely upon with American Safety that if there were material misrepresentations, there can be no recovery at all. And I would submit it on the briefs unless Your Honor have any other questions with respect to Beckford. Okay. Thank you. Ms. Maloney, can I ask you to come back up to the podium? Certainly. Thank you. I'm still working on this question as to what we know and what we don't know with respect to how much of this report was sent to your client. You say that the first three pages of 8th Stamp 491 through 493 were sent, but the next page, 8th Stamp 494, was not sent. Were the photographs sent? I was looking at her testimony, and it looks to me that she said she received, what she received was Joint Exhibit 53, which looks like is ASI 456 to 461. I'm reading from ER 676. That's where her testimony begins about the inspection report and what she received. It says ER 675. It says you identified. ER 675. I'm trying to find where she says how many photographs she received so I can. She says they do require photographs. I received a copy of the inspection with, I believe, two photographs. Correct. On page 116 of the transcript of ER 675. So she received at least some photographs along with this inspection report? Correct. She received some photographs because, again, they thought they were insuring a 110-meter department building. The reason that may be a little confusing, relevant to me is that I see photographs here in the excerpts of record that have bait stamps that are in sequence. Now, the page she claims not to have seen is bait stamp BD 494, but the photographs are bait stamp BD 499, 400, and so on. For her to be correct that this page saying no sprinklers was not received by her, Bedford had to have sent the first three pages and some of the later pages and not sent the intervening pages. That strikes me as improbable. I think I can clarify that. There were two sets of photographs that were provided. Some of the photographs were provided by the insured themselves and forwarded to Bedford, who forwarded them on, and then other photographs were taken as part of the inspection report and forwarded. Now, here's something that struck me as I read Judge Ezra's order. When he's talking about the material misrepresentation that gives your client right to rescind, he doesn't talk about sprinkler systems. He doesn't talk about any of this stuff. The only thing he talks about is the casino. And the summary judgment papers filed before him spent a lot of time on, well, but the inspection report negates this, negates this, negates this, negates that. Well, about the only thing the inspection report didn't seriously sort of unambiguously negate, as I'm now seeing the inspection report, seems to have been the casino. That is to say, I think I now understand why Judge Ezra relied only in his discussion on the casino point. Does that coincide with your sense of what Judge Ezra thought he was doing? Well, I think what Judge Ezra did was he took a look at the totality of the circumstances and the number of misrepresentations on four different applications over a period of time. This is not something where it was one question that was asked and it was answered improperly. This was four different applications over a period of a year and a half where they repeatedly made the same misrepresentations. Let's also not forget that the fire occurred in the unoccupied, unsprinklered portion of the casino, which American Safety had no idea it was insuring. Well, and that may be, I mean, that seems to me is why Judge Ezra gave summary judgment for you folks, but not because of the other things. Okay. Thank you. Thank you. Thank you, Your Honor. I just want to address a couple of the things that were brought up in opposing counsel's arguments. First of all, whether or not those pages in the inspection report got to Apex ASI. Apex ASI, Claudia Kravlovich, testified that she did not receive that page. And Clement of Bedford, who the other defendant before you today, testified she did send that page. So there is at least a material issue of fact as to what the insurance company had when they made the decision. So for purposes of summary judgment, we should assume that they had it. Yes. Thank you, Your Honor. I think that the next thing as far as the casino, I think there's a material issue of fact of whether or not they needed to disclose whether or not there was a casino on this property. I set out in my papers the gaming activity that has occurred on this property since 1955, which is essentially one day every two years they turn on some game machines, gaming regulators come in, make sure they're on, then they leave. No actual gaming takes place. Not a dollar is bet. The casino is not open for public use. There hasn't been, it hasn't been open for public use since 1955 when Sammy Davis, Jr. was there, and this was the only casino available for African Americans in the United States of America. This is not, there is no casino here, and at least the jury should be able to consider whether or not there is a casino. And I think Judge Ezra, in assuming there was a casino, and then assuming whether or not, even if there was a casino, that that's a material error, I think that the underwriter, Claudia Kravlovich, also testified that if there was a casino, that wouldn't really affect the property coverage. That would only affect the general liability coverage. So I think there's two issues here for the jury on the casino. One, was there a casino? And two, if there was a casino, was it material, especially in light of what this casino last time had operated? My time is up. If you have any. Any further questions from the bench? None at this time. Okay. Thank you very much. Thank you both sides for their argument. The case of CBC Financial versus Apex Insurance Managers is now submitted for decision.
judges: Fletcher, Tallman, Bertelsman